PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-1520
No. 09-1760
No. 09-1960

_____

EUDULIO DE LEON-OCHOA, a/k/a Roger Reyes-Oliva,
a/k/a Roger Armando Reyes-Bolivar, a/k/a Roger Armando
Reyes-Oliva,


Petitioner No. 09-1520


v.


ATTORNEY GENERAL OF THE UNITED STATES,


Respondent
_____

EUFEMIA FLORES-DOMINGUEZ; ARELY
MAGDALENA
RIVERA-FLORES; ELIDA YAMILET RIVERA-FLORES,


Petitioners No. 09-1760

v.

ATTORNEY GENERAL OF THE UNITED STATES,


Respondent

_____


R.E. L-P,


Petitioner No. 09-1960


v.


ATTORNEY GENERAL OF THE UNITED STATES,


Respondent

_____


On Petition for Review of Orders of the
Board of Immigration Appeals
(Agency No. A098-501-296)
(Agency No. A094-902-120/1/2)
(Agency No. A094-934-034)

Immigration Judge: Margaret Reichenberg
(Nos. 09-1520, 09-1760)

Immigration Judge: Annie S. Garcy (No. 09-1960)

———————

Argued on July 13, 2010

———————

Before: FUENTES, ALDISERT and ROTH, <u>Circuit Judges</u>
(Opinion Filed: October 1, 2010)

DOUGLAS S. EAKELEY, ESQ. (ARGUED)
MAUREEN A. RUANE, ESQ.
CARL M. GREENFELD, ESQ.
KRISTIN A. MUIR, ESQ.
LOWENSTEIN SANDLER PC
65 Livingston Avenue
Roseland, NJ 07068

     Attorneys for Petitioner Eudulio De Leon-Ochoa

REX CHEN, ESQ. (ARGUED)
CATHOLIC CHARITIES OF THE ARCHDIOCESE OF
NEWARK
976 Broad Street
Newark, NJ 07102

     Attorney for Petitioners Eufemia Flores-Dominguez,
     Arely Rivera-Flores, and Elida Rivera-Flores

AYODELE GANSALLO, ESQ. (ARGUED)
HIAS AND COUNCIL MIGRATION SERVICE OF
PHILADELPHIA

2100 Arch Street
Philadelphia, PA 19103

Attorney for Petitioner R.E. L-P-

TONY WEST, ESQ.
Assistant Attorney General, Civil Division

DOUGLAS E. GINSBURG, ESQ.
EMILY ANNE RADFORD, ESQ.
TERRI J. SCADRON, ESQ.
Assistant Directors

AVIVA L. POCZTER, ESQ. (ARGUED)
GREG D. MACK, ESQ.
Senior Litigation Counsel

DEREK C. JULIUS, ESQ.
Trial Attorney
JAMES A. HUNOLT, ESQ.
GARY J. NEWKIRK, ESQ.
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044

Attorneys for Respondent

_____

# OPINION

_____

ALDISERT, <u>Circuit Judge</u>.

In this consolidated appeal, Petitioners Eudulio De Leon-Ochoa, Arely and Elida Rivera-Flores, Eufemia Flores-Dominguez, and R.E. L-P- petition for review of the Board of Immigration Appeals' ("BIA" or "Board") denial of their applications for Temporary Protected Status ("TPS") for failure to personally satisfy the statutory requirements of "continuous residence" and "continuous physical presence."[1] 8 U.S.C. § 1254a. On appeal, Petitioners contend that they fulfill the statutory requirement of "continuous residence," 8 U.S.C. § 1254a(c)(1)(A)(ii), via imputation of their parents' residence. Petitioners additionally contend that they satisfy the statutory requirement of "continuous physical presence," 8 U.S.C. § 1254a(c)(1)(A)(i), because the statutory term "most recent designation" rightfully is read to encompass TPS extensions as well as designations. We disagree on both counts. Because Petitioners fail to meet the requirements of "continuous residence" and "continuous physical presence," they are statutorily ineligible for TPS. For the following reasons, we will

---

[1] The Board had jurisdiction under 8 C.F.R. §§ 1003.1(b)(3) & 1240.15. We have jurisdiction over final orders of removal pursuant to 8 U.S.C. § 1252(a)(1).

5

deny review.[2]

I.

Temporary Protected Status is authorized by Section 244 of the Immigration and Nationality Act ("INA"). 8 U.S.C. § 1254a. It permits eligible nationals of a foreign state to temporarily remain in and work in the United States while the state is designated by the TPS program. Id. The Attorney General, "after consultation with appropriate agencies of the Government," may issue a TPS designation with respect to a foreign state under certain circumstances such as ongoing armed conflict, natural disaster, or other conditions preventing safe return of aliens.[3] Id. § 1254a(b)(1). "There is no judicial review

---

[2] The Government argues, in the petition for review of Flores-Dominguez, et al., that we should dismiss this case for lack of jurisdiction because the question whether a parent's residency can be imputed for purposes of the TPS program is a nonjusticiable political question. Curiously, the Government does not make this argument in De Leon-Ochoa and L-P-'s petitions for review. We determine that there is no merit to this argument.

[3] Originally the Attorney General was empowered to designate a foreign state for the TPS program. Pursuant to the Homeland Security Act of 2002, the administration of the TPS program was transferred to the Department of Homeland Security. Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135; see Cervantes v. Holder, 597 F.3d 229, 231 n.2

of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." Id. § 1254a(b)(5)(A). By statute, aliens are eligible for Temporary Protected Status if they are nationals of a state designated under § 1254a(b)(1) and they meet the following requirements:

> (i) the alien has been continuously physically present in the United States since the effective date of the most recent designation of that state;
>
> (ii) the alien has continuously resided in the United States since such date as the Attorney General may designate;
>
> (iii) the alien is admissible as an immigrant, except as otherwise provided under paragraph (2)(A), and is not ineligible for temporary protected status under paragraph (2)(B); and
>
> (iv) to the extent and in a manner which the Attorney General establishes, the alien registers for the temporary protected status under this section during a registration period of not less than 180 days.

---

(4th Cir. 2010).

Id. § 1254a(c)(1)(A) (emphasis added). Pursuant to § 1254a(c)(2), in the determination of an alien's admissibility for purposes of requirement (iii), the Attorney General may waive certain provisions of section 1182(a) for humanitarian purposes, to assure family unity or for other public interest purposes, with the exception of certain sections relating to criminals, drug offenses, and national security. By the terms of the statute, this waiver provision does not apply to the requirements of continuous residence and physical presence. Id. § 1254a(c)(2).

The TPS statute instructs that brief, casual, and innocent departures generally do not effect a failure to maintain continuous physical presence and continuous physical residence for purposes of the TPS program.[4] Notably, the statute

---

[4] Pursuant to 8 U.S.C. § 1254a(c)(4):

(4) Treatment of brief, casual, and innocent departures and certain other absences

(A) For purposes of paragraphs (1)(A)(i) and (3)(B), an alien shall not be considered to have failed to maintain continuous physical presence in the United States by virtue of brief, casual, and innocent absences from the United States, without regard to whether such absences were authorized by the Attorney General.

(B) For purposes of paragraph (1)(A)(ii), an alien shall not be considered to have failed to maintain continuous residence in the United States by reason of a brief, casual, and innocent absence described in subparagraph (A) or due merely to a brief

8

specifically prescribes that "[n]othing in this section shall be construed as authorizing an alien to apply for admission to, or to be admitted to, the United States in order to apply for temporary protected status under this section." Id. § 1254a(c)(5).

The applicable regulations repeat the requirements for TPS and also provide for late registration, specifically by children of eligible grantees. An alien from a designated state may apply for Temporary Protected Status in accordance with applicable regulations:

> Except as provided in §§ 1244.3 and 1244.4, an alien may in the discretion of the director be granted Temporary Protected Status if the alien establishes that he or she:
>
> (a) Is a national, as defined in section 101(a)(21) of the Act, of a foreign state designated under section 244(b) of the Act;
>
> (b) Has been continuously physically present in the United States since the effective date of the most recent designation of that foreign state;
>
> (c) Has continuously resided in the United States since such date as the Attorney General may designate;

---

temporary trip abroad required by emergency or extenuating circumstances outside the control of the alien.

. . . .

(f)(1) Registers for Temporary Protected Status during the initial registration period announced by public notice in the Federal Register, or

> (2) During any subsequent extension of such designation if at the time of the initial registration period:
>
> . . . .
>
> (iv) The applicant is a spouse or child of an alien currently eligible to be a TPS registrant.

(g) Has filed an application for late registration with the appropriate Service director within a 60-day period immediately following the expiration or termination of conditions described in paragraph (f)(2) of this section.

8 C.F.R. § 1244.2. Under the regulations, the child or spouse of a person who was eligible for TPS during the initial registration period may apply for TPS during any subsequent extension thereof.

II.

A.  Eudulio De Leon-Ochoa, etc., v. Attorney General, No. 09-1520

Petitioner Eudulio De Leon-Ochoa is a national and citizen of Honduras. He entered the United States on or about November 30, 2005, without proper documentation. He was served with a Notice to Appear on November 30, 2005, and charged with removability pursuant to Section 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA"). He applied for asylum, withholding of removal, protection under the Convention Against Torture ("CAT"), and TPS. The IJ issued an oral decision finding Petitioner removable on November 27, 2007.

(1) Asylum, Withholding of Removal, and CAT Protection

At the IJ hearing, De Leon-Ochoa testified that he is part of the Turcios family and that his family is embroiled in a blood feud with the Najera family in Rio Chito, Honduras. Petitioner alleged that the Najera family killed three different members of his family and that the police failed to investigate these deaths. Two of the death certificates omitted cause of death. Petitioner claimed there was political tension between the two families based on the Turcios' support of the National Party and the Najera's support of the Liberal Party. Petitioner testified to participating in politics twice between 2002 and 2004. He claims the Liberal Party told him to move or leave his polling station both times. He also testified that no one in his family has held office with the National Party. Petitioner testified that the Najera family was suspected of other political murders.

De Leon-Ochoa testified that he believed he would be killed by the Najera family if he returned to Honduras. He

11

testified that he could not be protected due to the Najera family's political power and did not have anywhere to stay in Honduras besides his hometown. Petitioner claimed his older brother told him he has no freedom because he fears the Najera will attack him. He admitted that his father did not have trouble with the Najera family before his father left Honduras in 1998, and that his father is not a member of the Turcios family. Petitioner's father testified that there was a blood feud between the Turcios family and the Najera family, and described several killings. The father conceded that neither his wife nor his sons had problems with the Najera family. He explained that women were not targeted in the conflict, and that the sons were not harmed because they did not enter Najera territory. Nonetheless, the father claimed that he still feared for his sons' safety and that the Najera family was still searching for them.

The IJ found Petitioner's testimony to be credible and consistent with his written asylum application, but ultimately found that Petitioner did not show he was a victim of past persecution, nor did he prove an objective fear of future persecution. The IJ held that Petitioner failed to show a likelihood of persecution because his immediate family had not been harmed, he left Honduras six years after the most recent killing of a member of the Turcios family, and there was no evidence that the feud continued past 1996. Although the IJ accepted that "family" could be a social group for purposes of the statute, the IJ found that Petitioner failed to establish an objective fear of future persecution, was not persuaded by Petitioner's minimal political activity, and did not believe that the Honduran government was complicit in any of the alleged activity. Ultimately the IJ denied Petitioner's asylum,

12

withholding of removal and CAT claims.

(2) Temporary Protected Status

The IJ held De Leon-Ochoa to be ineligible for TPS because of his failure to personally satisfy the continuous physical presence and continuous residence requirements. Honduran TPS applicants must demonstrate continuous residence from December 30, 1998, and they must demonstrate physical presence from January 5, 1999. See 8 U.S.C. § 1254a(c)(1)(A)(i)-(ii) (requiring a TPS applicant to be "continuously physically present" since the "most recent designation" and to have "continuously resided" since the date the Attorney General designates); 64 Fed. Reg. 524 (Jan. 5, 1999) (designating Honduras for the TPS program). Petitioner did not arrive in the United States until November 2005, and the IJ therefore concluded that he was prima facie ineligible for TPS.

Petitioner appealed the IJ's decision to the BIA, which dismissed his appeal on January 30, 2009. The BIA found the IJ did not err in determining that Petitioner failed to establish a well-founded fear of persecution or a likelihood of torture should he return to Honduras. The BIA agreed, additionally, that Petitioner was ineligible for TPS because he could not meet the continuous residence and physical presence requirements, rejecting arguments based on imputation and humanitarian concerns. The BIA dismissed his appeal and the instant petition for review followed.

B.      Eufemia Flores-Dominguez, et al., v. Attorney

13

Petitioners Arely Rivera-Flores, Elida Rivera-Flores, and Eufemia Flores-Dominguez are the 14 year-old and 13 year-old daughters and the mother of Rosa Flores, a current TPS grantee. Petitioners are nationals and citizens of El Salvador who entered the United States on or about November 1, 2006, without proper documentation. They were served Notices to Appear on November 16, 2006, and charged with removability under Section 212(a)(6)(A)(i) of the INA. Petitioners applied to United States Citizenship and Immigration Services ("USCIS") for TPS on June 10, 2007. El Salvadoran TPS applicants must establish continuous physical presence in the United States since March 9, 2001, and continuous residence since February 13, 2001. See 8 U.S.C. § 1254a(c)(1)(A)(i)-(ii); 66 Fed. Reg. 14,214 (Mar. 9, 2001) (designating El Salvador for the TPS program). On August 16, 2007, an IJ issued orders of removal, denying their request for a continuance to permit adjudication of the TPS applications. The IJ stated she had authority only to review USCIS denial of a TPS application, with no power of de novo review. Petitioners appealed to the BIA on September 7, 2007. Subsequently, on November 19, 2007, USCIS sent Petitioners a Notice of Intent to Deny, requesting additional information. Petitioners failed to respond and USCIS denied their TPS applications on April 10, 2008, for failure to meet the continuous physical presence and continuous residence requirements. On May 8, 2008, Petitioners moved for a remand to permit the IJ to adjudicate their TPS applications. On February 23, 2009, the BIA dismissed their appeal as moot because USCIS had denied the TPS applications. The BIA dismissed the Petitioners' motion to remand for a de novo

14

review of the TPS applications for failure to meet the prima facie statutory requirements, and the instant petition for review followed.

### C.    R.E. L-P- v. Attorney General, No. 09-1960

Petitioner L-P- is the 16 year-old daughter of Maria M. Montane, a current TPS grantee. She and her mother are nationals and citizens of El Salvador. Petitioner entered the United States on or about March 31, 2007, at the age of 13, without proper documentation. She was served a Notice to Appear on April 4, 2007, and charged with removability pursuant to Section 212(a)(6)(A)(i) of the INA. On January 18, 2008, Petitioner filed an application for TPS with USCIS as the child of a current TPS grantee. El Salvadoran TPS applicants must establish continuous physical presence in the United States since March 9, 2001, and continuous residence since February 13, 2001. See 8 U.S.C. § 1254a(c)(1)(A)(i)-(ii); 66 Fed. Reg. 14,214 (Mar. 9, 2001) (designating El Salvador for the TPS program). Petitioner's application was denied by USCIS for failure to demonstrate satisfaction of the statutory requirements. There was no administrative appeal. Petitioner asserted her eligibility for TPS before the IJ, who denied her application by oral decision on July 28, 2008. The IJ found that Petitioner failed to meet the continuous physical presence and continuous residence requirements and was therefore not eligible for TPS. Petitioner appealed to the BIA, arguing her mother's residency and physical presence should be imputed to her and that the physical presence requirement should be read to encompass the most recent extension of TPS designation, not the date of initial designation. She additionally argued the IJ's denial was

15

erroneous on humanitarian grounds. The BIA dismissed the appeal on March 6, 2009, holding that Petitioner was statutorily ineligible for TPS and that both the BIA and IJ were constrained by the statute and regulations and did not have the discretion to grant TPS on humanitarian or family-unity grounds. The instant petition for review followed.

III.

As a threshold matter, we must determine what deference, if any, to accord the BIA's single-member, unpublished and nonprecedential decisions from which Petitioners seek review. When the Board issues its own opinion, as here, and does not adopt the IJ's findings, we review only the decision of the Board. Li v. Att'y Gen., 400 F.3d 157, 162 (3d Cir. 2005). We review legal questions de novo, with appropriate deference for the BIA's reasonable interpretations of statutes it is charged with administering. Silva-Rengifo v. Att'y Gen., 473 F.3d 58, 63 (3d Cir. 2007) (citing INS v. Aguirre-Aguirre, 526 U.S. 415 (1999) and Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984)); see also Duvall v. Att'y Gen., 436 F.3d 382, 386 (3d Cir. 2006) ("We have jurisdiction to consider the decision of the Board of Immigration Appeals under 8 U.S.C. § 1252(b)(2), and exercise plenary review over questions of law, with due deference to the agency's interpretation of the Immigration and Naturalization Act (INA).").

Under the familiar two-step Chevron inquiry, first, if the statute is clear we must give effect to Congress' unambiguous intent, and, second, if the statute is silent or ambiguous with

16

respect to a specific issue, we defer to an implementing agency's reasonable interpretation of that statute. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-843 (1984). After United States v. Mead Corp., 533 U.S. 218 (2001), we accord Chevron deference only to agency action promulgated in the exercise of congressionally-delegated authority to make rules carrying the force of law. Mead Corp., 533 U.S. at 226-227. Agency action that does not qualify for Chevron deference may still deserve a lesser amount of deference under Skidmore v. Swift & Co., 323 U.S. 134 (1944), under which respect is granted to agency action according to its power to persuade. Skidmore, 323 U.S. at 140. Mead resuscitated Skidmore, because "Chevron did nothing to eliminate Skidmore's holding that an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency . . . , and given the value of uniformity in its administrative and judicial understandings of what a national law requires." Mead, 533 U.S. at 234-235 (citations omitted).

Although we routinely accord Chevron deference to published decisions of the BIA, see INS v. Aguirre-Aguirre, 526 U.S. 415, 424 (1999), this Court has never announced the deference due an unpublished decision rendered by a single member of the BIA. In Smriko v. Ashcroft, we declined to determine the deference due an IJ's decision affirmed through the BIA's streamlining procedure, but observed in dictum that "[a]lthough the BIA has directed us to review the IJ's opinion in streamlined cases, deferring to the reasoning of an IJ from which the BIA would be free to depart in other cases would

17

seem highly problematic." 387 F.3d 279, 289 n.6 (3d Cir. 2004).

No consensus exists among our sister Courts of Appeals as to what quantum of deference, if any, should be accorded to these opinions. After Mead, several Courts of Appeals affirmatively rejected application of Chevron deference to unpublished BIA decisions. See Quinchia v. Att'y Gen., 552 F.3d 1255, 1258 (11th Cir. 2008) (stating that an unpublished BIA decision that does not rely on BIA or Court of Appeals precedent does not receive Chevron deference); Rotimi v. Gonzales, 473 F.3d 55, 57-58 (2d Cir. 2007) (holding that an unpublished BIA decision that does not rely on precedent for its definition of a contested term does not receive Chevron deference, because it is not "promulgated under [the agency's] authority to make rules carrying the force of law") (internal quotation marks omitted); Garcia-Quintero v. Gonzales, 455 F.3d 1006, 1012-14 (9th Cir. 2006) (opining that an unpublished BIA decision does not have the force of law and therefore does not receive Chevron deference). But see Gutnik v. Gonzales, 469 F.3d 683, 689-690 (7th Cir. 2006) (according Chevron deference to BIA's streamlined adoption of IJ decision).

Some Courts of Appeals have declared that unpublished opinions of the BIA are to be accorded Skidmore deference. See Carpio v. Holder, 592 F.3d 1091, 1097-1098 (10th Cir. 2010) ("If the interpretation is not precedential within the agency, then the interpretation does not qualify for Chevron deference. . . . Because the BIA's decision does not 'carry the force of law,' Mead Corp., 533 U.S. at 226, we must examine the BIA's decision in [petitioner's] case under the framework set forth in Skidmore.") (citations omitted); Barrios v. Holder, 581 F.3d

18

849, 859 (9th Cir. 2008) ("A single-member BIA panel affirmed the IJ's decision in an unpublished, nonprecedential decision. Such decisions are entitled to only Skidmore, rather than Chevron, deference."). Many Courts of Appeals have declined to announce a standard. See Dobrova v. Holder, 607 F.3d 297, 300 (2d Cir. 2010) ("Whether unpublished BIA opinions are entitled to Skidmore deference or whether they are reviewed de novo is an open question in this Circuit. . . . We need not answer that question here, however, because even on de novo review, we find the meaning . . . to be clear and unambiguous."); Cervantes v. Holder, 597 F.3d 229, 233 n.5 (4th Cir. 2010) ("We need not resolve in this proceeding whether nonprecedential BIA decisions are entitled to Chevron deference, or merely to Skidmore deference. As explained below, we would deny the petition for review under the less deferential standard of Skidmore."); Mushtaq v. Holder, 583 F.3d 875, 877 (5th Cir. 2009) ("We need not resolve this question, because Mushtaq's claim fails under either standard. Thus, we review it under the less-deferential Skidmore standard."); Guo Qi Wang v. Holder, 583 F.3d 86, 90 n.2 (2d Cir. 2009) ("While we have not yet decided whether unpublished, single-member BIA decisions are entitled to the lesser form of deference described in Skidmore, we need not consider the issue here as we would reach the same result reviewing this petition de novo.") (citations omitted); Godinez-Arroyo v. Mukasey, 540 F.3d 848, 851 (8th Cir. 2008) ("We need not address it here, as we hold that even applying the lesser Skidmore deference, we affirm the persuasive BIA decision.").

We note parenthetically that unpublished, single-member BIA decisions have no precedential value, do not bind the BIA,

19

and therefore do not carry the force of law except as to those parties for whom the opinion is rendered. We agree with the Court of Appeals for the Ninth Circuit that, "[i]n light of Mead, the 'essential factor' in determining whether an agency action warrants Chevron deference is its precedential value." Garcia-Quintero, 455 F.3d at 1012. An unpublished BIA opinion is not issued pursuant to the BIA's authority to make rules carrying the force of law. We further agree that

> [t]he unpublished designation of the decision also makes it clear that it was not issued pursuant to the BIA's authority to make rules that carry the force of law. Again, according to the Board's own internal policies, "[u]npublished decisions are binding on the parties to the decision but are not considered precedent for unrelated cases."

Id. at 1013 (citations omitted).[5]

---

[5] By brief and at oral argument, Petitioners argue that under Cruz v. Attorney General, 452 F.3d 240, 250 (3d Cir. 2006), we are obligated to order the Board to accord precedential value to its unpublished decision in Matter of Reyes (BIA, Feb. 9, 2005) (unpublished), wherein a single member of the BIA issued a nonprecedential opinion finding the spouse of an eligible TPS applicant to be eligible for TPS under the applicable regulations notwithstanding her failure to meet the "nationality" requirement. Alternatively, Petitioners argue that no deference is due the BIA's nonprecedential opinions from which they seek review because they effect an unexplained

deviation from <u>Matter of Reyes</u>. In <u>Cruz</u>, we opined that

> [w]hile the unpublished BIA decisions we have
> consulted are not necessarily in the category of
> "selected decisions . . . designated to serve as
> precedents in all proceedings involving the same
> issue or issues," 8 C.F.R. § 1003.1(g), agencies
> should not move away from their previous rulings
> without cogent explanation. . . . Where there is a
> consistent pattern of administrative decisions on
> a given issue, we would expect the BIA to
> conform to that pattern or explain its departure
> from it.

452 F.3d at 250 (citations omitted). <u>Cruz</u> and <u>Matter of Reyes</u>
do not assist Petitioners. First, <u>Matter of Reyes</u> has absolutely
no binding precedential value. <u>Cf.</u> <u>Johnson v. Ashcroft</u>, 286
F.3d 696, 700 (3d Cir. 2002) (requiring reason to depart from
established "precedents"). Second, the issues of "continuous
physical presence" and "continuous residency" are factually
distinct from that of "nationality" and therefore do not
implicate "the same issue or issues." <u>Cruz</u>, 452 F.3d at 250.
Third, <u>Matter of Reyes</u> does not comprise a "consistent
pattern of administrative decisions on a given issue," to which
we would expect the BIA to conform or from which a
departure should be justified. Fourth, we have before us three
<u>consistent</u> unpublished BIA opinions requiring late registrants
under the guidelines to personally comply with the statutory
requirements. Accordingly, under <u>Cruz</u>, if the BIA is required

21

All parties before the Court failed to brief the issue of appropriate deference for unpublished BIA decisions. This is an open question in our Court with widespread ramifications for appellate review of all such non-precedential BIA decisions. See Smriko v. Ashcroft, 387 F.3d 279, 296 (3d Cir. 2004) (observing that finding of jurisdiction to review BIA streamlining decisions is of "substantial importance" because of the number of possible invocations). Because it was not briefed, barely argued, and is not dispositive for the issues before us, we decline to resolve this question. For the reasons that follow, we hold that under any standard of review, we cannot grant Petitioners relief.[6]

to explain its departure from a position taken in an unpublished decision, it would be that of the three congruous opinions before us today, not the anomalous position adopted in Matter of Reyes. Finally, because "unpublished precedent is a dubious basis for demonstrating the type of inconsistency which would warrant rejection of deference," De Osorio v. INS, 10 F.3d 1034, 1042 (4th Cir. 1993), "[w]e will not bind the BIA with a single non-precedential, unpublished decision any more than we ourselves are bound by our own unpublished orders." Leal-Rodriguez v. INS, 990 F.2d 939, 946 (7th Cir. 1993).

[6] Although the parties similarly failed to propose it, we have considered remanding to the BIA for a precedential opinion in the first instance. See Smriko, 387 F.3d 279

22

IV.

Applying <u>de novo</u> review, we now turn to the arguments of the parties. In their petitions for review, Petitioners argue that the IJ and the BIA erred in denying Temporary Protected Status for failure to meet the "continuous residence" and "continuous physical presence" requirements for TPS eligibility. 8 U.S.C. § 1254a(c)(1)(A)(i)-(ii). Petitioners concede that they fail to personally meet the statutory requirement of "continuous residence" from "such date as the Attorney General [has] designate[d]," but argue in their petitions that they have constructively met the requirement through imputation of their parents' residence. <u>Id.</u> § 1254a(c)(1)(A)(ii). Petitioners contend additionally that under the plain meaning of the statute, they

_____

(remanding petitioner's appeal of BIA's streamlined affirmance of IJ's opinion to allow the BIA to address petitioner's novel issue of law, in the first instance, in a precedential opinion); <u>see also</u> <u>Dobrova v. Holder</u>, 607 F.3d 297, 300 (2d Cir. 2010) ("[S]ince here we determine that the text of the relevant statute is clear, and the only question presented on appeal is a purely legal one, remand to the BIA for precedential interpretation in the first instance is unnecessary."); <u>Gutnik v. Gonzales</u>, 469 F.3d 683, 691 (7th Cir. 2006) (reading 8 C.F.R. § 1003.1(e)(4)-(5) together to require only that the BIA not review cases resolving novel issues by affirmance without opinion, but not requiring a single BIA member to refer an appeal to a three-member panel). We decline to do so because, as in <u>Dobrova</u>, the questions presented are purely legal and therefore properly before us.

23

have met the "continuous physical presence" requirement, because the statutory term "most recent designation" encompasses extensions of a TPS designation. Id. § 1254a(c)(1)(A)(i). We disagree, for the reasons that follow.

## A.

Petitioners argue that their parents' undisputed satisfaction of the "continuous residence" requirement should be "imputed" to them for purposes of their own TPS eligibility. The Government argues that the plain text of the statute, the implementing regulations, and the consistent position of the Attorney General require applicants to individually satisfy the "continuous residence" requirement. We agree with the Government.

## 1.

We note at the outset that we are only the second Court of Appeals to address the question of imputation for the purposes of the TPS program. In a case running on all fours with our own, the Court of Appeals for the Fourth Circuit recently affirmed, under the less deferential Skidmore standard, a single-member, nonprecedential opinion of the BIA rejecting the petitioner's argument that he met the statutory TPS requirements via imputation. Cervantes v. Holder, 597 F.3d 229 (4th Cir. 2010). Relying on statements in the Federal Register that a late registration is "not intended to extend to persons who arrived in the United States . . . after the [TPS] designation was made" and the failure of the statute to affirmatively permit imputation, the Cervantes court found the BIA's construction permissible under Skidmore deference. Id. at 237 (quoting 63 Fed. Reg. 63,593, 63,594 (Nov. 16, 1998)). As in Cervantes, Petitioners urge us to rely on a series of cases out of the Court of Appeals for the Ninth Circuit to distinguish both Cervantes and our own

24

precedent in Augustin v. Attorney General, 520 F.3d 264 (3d Cir. 2008). We decline to do so.

Petitioners rely primarily on a line of case law, interpreting several incarnations of the cancellation of removal statute, permitting imputation for both domicile and residency. This line originates with Lepe-Guitron v. INS, 16 F.3d 1021 (9th Cir. 1994), in which the Court of Appeals for the Ninth Circuit held that a parent's domicile is imputed to an unemancipated minor child for the purposes of the domicile requirement of the statutory precursor to the current cancellation of removal statute. Id. at 1022. According to the court, domicile "incorporates the concept familiar in other areas of law," impelling the conclusion that a child's domicile follows that of his or her parents because children are legally incapable of forming the requisite intent. Id. at 1025 (quotations and citations omitted). That court has since equated parental domicile to residence as used in the cancellation of removal statute. See Mercado-Zazueta v. Holder, 580 F.3d 1102 (9th Cir. 2009) (permitting imputation of parent's lawful permanent resident status to satisfy cancellation of removal statute's five-year requirement of lawful permanent residence); Cuevas-Gaspar v. Gonzales, 430 F.3d 1013 (9th Cir. 2005) (permitting imputation of parent's residence to satisfy seven-year continuous residence requirement for cancellation of removal).[7]

---

[7] In 2007, the BIA declined to apply Cuevas-Gaspar, refusing to impute a parent's residency to satisfy the seven-year residence requirement of the cancellation of removal statute. Escobar, 24 I. & N. Dec. 231 (BIA 2007); see also Augustin, 520 F.3d at 269 (discussing Escobar). The BIA expressly disagreed with Cuevas-Gaspar, agreeing instead with the position of the dissenting opinion and finding that residence differs from domicile because it contains no element of intent, and thus imputation is not proper. Escobar, 24 I. & N. Dec. at

25

Under our own precedent in Augustin, we disagree. In Augustin, under Chevron deference, we affirmed the BIA's refusal to impute a parent's lawful permanent resident status to an alien for purposes of cancellation of removal. Augustin, 520 F.3d at 270; see also Cervantes, 597 F.3d at 236-237; Deus v. Holder, 591 F.3d 807, 811-812 (5th Cir. 2009) (affirming BIA's refusal to impute parent's "residence"); Cuevas-Gaspar, 430 F.3d at 1032 (Fernandez, J., dissenting) ("[T]here is no legal reason for us to turn to [petitioner's] parents to determine [petitioner's] intent[.]"). We observed that the INA, as amended, did not expressly address the issue of imputation. Augustin, 520 F.3d at 269. It neither permitted it nor disallowed it. We determined the BIA's interpretation to be a reasonable construction of the statute. Id. at 270-272. We distinguished residence from domicile, because under the INA, residence is defined as an alien's "principal, actual dwelling place in fact, without regard to intent." 8 U.S.C. § 1101(a)(33) (emphasis

233. The petitioner appealed the BIA's adverse ruling to the Ninth Circuit which subsequently filed Escobar v. Holder, 567 F.3d 466 (9th Cir. 2009), overturning the BIA. Apparently unbeknownst to the Ninth Circuit, however, the BIA re-opened the case on April 21, 2009, to hear argument on the respondent's prior motion to suppress, unrelated to Escobar's TPS application. 2009 WL 1364840 (BIA Apr. 21, 2009) (unpublished decision). The Ninth Circuit then vacated its opinion in Escobar v. Holder and dismissed the petition for rehearing as moot. Escobar v. Holder, 572 F.3d 957 (9th Cir. 2009). The Ninth Circuit was not to be deterred. In Mercado-Zazueta v. Holder, the Ninth Circuit quoted verbatim the vast majority of the vacated Escobar opinion, 567 F.3d 466, thereby resuscitating it. 580 F.3d 1102 (9th Cir. 2009). The BIA continues to rely on Escobar outside the jurisdiction of the Ninth Circuit. See, e.g., Ramirez-Vargas, 24 I. & N. Dec. 599 (BIA 2008).

added). Thus, "any authority regarding the imputation of a 'domicile' is unavailing to the Petitioners [in establishing the statutory 'residence']." Cervantes, 597 F.3d at 236 (citing Augustin, 520 F.3d at 271). In Augustin, we rejected the Ninth Circuit's trajectory, and Petitioners before us present no compelling argument for a change in course.

2.

As in Augustin, Petitioners here fail to identify statutory language, regulatory language, or legislative history even suggesting, much less mandating, that a parent's residency be imputed to minor children for purposes of satisfying the TPS requirements. Although we are sympathetic to their plight, Petitioners have failed to persuade us that the plain language of the statute does not control. On our reading, the statutory requirements of TPS "could not be more clear." Cuevas-Gaspar, 430 F.3d at 1032 (Fernandez, J., dissenting). A TPS applicant must show that he or she "has continuously resided in the United States since such date as the Attorney General may designate." 8 U.S.C. § 1254a(c)(1)(A)(ii) (emphasis added). We have recognized that the Chevron inquiry ends if Congress has spoken directly to the question at issue, in which case "both the agency and the court must give effect to the plain language of the statute." Yusupov v. Att'y Gen., 518 F.3d 185, 197 (3d Cir. 2008). Although we do not here apply Chevron deference, we review the statute to determine whether Congress has directly spoken to the question at issue.

a.

Petitioners contend that § 1254a is "ambiguous" regarding imputation simply because the statute does not explicitly permit or disallow it, and there is therefore no "plain meaning." We disagree. The statute unquestionably articulates

27

a requirement that a TPS applicant continuously reside in the United States from the date designated by the Attorney General. The statute then specifies that brief, casual, and innocent departures generally do not effect a failure to maintain continuous residence for purposes of the TPS program. 8 U.S.C. § 1254a(c)(4). Notably, § 1254a(c)(4) makes no mention of alternate methods of satisfying the residence requirements. We do not consider § 1254a to be "ambiguous" merely because it does not expressly forbid every possible mechanism for functional – but not actual – satisfaction of statutory requirements. Else, near every statute would be "ambiguous" and courts would have unfettered freedom to fashion creative mechanisms for satisfying the otherwise clear requirements mandated by Congress. This we decline to do.

b.

By the terms of the statute, the TPS program was designed to shield aliens already in the country from removal when a natural disaster or similar occurrence has rendered removal unsafe. 8 U.S.C. § 1254a(b)(1). We simply will not read into an unambiguous statutory requirement an exception that converts this statute into a program of entry for an alien. Id. § 1254a(c)(5) ("Nothing in this section shall be construed as authorizing an alien to apply for admission to, or to be admitted to, the United States in order to apply for temporary protected status under this section."). And, although we agree with Petitioners that our immigration framework values family unity, we cannot on that basis alone read into the unambiguous TPS statute an instruction by Congress to permit satisfaction of clear statutory requirements via the disputed mechanism of imputation.[8] Compare Augustin, 520 F.3d 264, with Cuevas-

---

[8] Petitioners argue that under the statutory scheme, the IJ and BIA have discretion to grant TPS for humanitarian reasons,

28

Gaspar, 430 F.3d 1013.

c.

Petitioners attempt to evade our compelling precedent in Augustin by distinguishing the underlying statutory frameworks. We are unpersuaded. On the contrary, we find the different purposes of the statutes to render imputation even less appropriate for the TPS program than for cancellation of removal. The cancellation of removal residency requirement is designed to gauge the extent of an alien's ties to the United States. A minor's parent's residence in the United States, though not dispositive, is relevant to a minor's ties to the country. The TPS program, by contrast, is designed to temporarily prevent removal of aliens during extraordinary and temporary conditions that prevent safe return. 8 U.S.C. 1254a(b)(1)(C). A minor's parent's residence in the United States is not relevant to whether that minor can be "safely returned" at the time of the initial designation. As in Augustin, "[a]lthough [this] ruling does deny relief to certain aliens, that alone cannot render [it] unreasonable. Congress restricted relief to those aliens who had [continuously resided in the United States from the designated date.] The BIA's refusal to create an exception simply heeds the statute's plain requirements." Augustin, 520 F.3d at 271.

---

and moreover they erred in not exercising it. This is demonstrably false. The provision cited by Petitioners, 8 U.S.C. § 1254a(c)(2)(A)(ii), permits waiver of provisions of § 1182, which applies exclusively to 8 U.S.C. § 1254a(c)(1)(A)(iii)'s requirement that the applicant be admissible as an immigrant, "except as otherwise provided under paragraph (2)(A)." (emphasis added). This provision is inapplicable to the "continuous residence" and "continuous physical presence" requirements at issue here. 8 U.S.C. § 1254a(c)(1)(A)(i)-(ii).

3.

Finally, our conclusion as to the plain language of the statutory requirements is bolstered by the consistent position of the Attorney General and the BIA. See, e.g., 73 Fed. Reg. 57,128, 57,132 (Oct. 1, 2008) (explaining that extension of TPS eligibility for nationals of El Salvador does not expand eligibility to those who have not continuously resided in the United States since February 13, 2001, and who have not been continuously present since March 9, 2001); 63 Fed. Reg. 63,593, 63,594 (Nov. 16, 1998) (stating that late registration is not intended to extend to persons who arrived in the United States after the program designation was made); see also Escobar, 24 I. & N. Dec. 231 (BIA 2007) (rejecting Cuevas-Gaspar and refusing to allow imputation for residency requirement of cancellation of removal). The Cervantes court was similarly persuaded, observing that "since 1998, when the regulations providing for late initial TPS registration were first adopted, the Attorney General has consistently applied this interpretation" and "the INS was emphatic that those applying for late initial TPS registration . . . must meet all other requirements of TPS including presence in the United States at the time the foreign state in question was designated for TPS." Cervantes v. Holder, 597 F.3d 229, 235 (4th Cir. 2010) (citations and quotations omitted).

B.

Petitioners additionally contend that the phrase "most recent designation" under the "continuous physical presence" requirement, 8 U.S.C. § 1254a(c)(1)(A)(i), should be read to refer not to the initial designation of a state for TPS, but instead to the most recent extension of a state's TPS designation. Petitioners' argument is unavailing.

30

Under the plain language of the statutory scheme, an extension of TPS does not constitute a "designation." Designation of a foreign state for TPS takes effect "upon the date of publication of the designation." 8 U.S.C. § 1254a(b)(2). The statute specifically provides for an "[e]xtension of designation," stating that the Attorney General may extend the period of designation. Id. § 1254a(b)(3)(C). To the extent Petitioners seek to emphasize the phrase "most recent," we agree with the Court of Appeals for the Fourth Circuit that "the statutory phrase 'most recent designation' merely distinguishes the current designation of a foreign state for the TPS program from any prior TPS program designations of that same foreign state." Cervantes, 597 F.3d at 235 (providing as an example the possibility of two separate disasters in the same state leading to two separate designations).

Indeed, reading "most recent designation" to apply to each extension would convert the TPS program into a program of entry, whereby each extension of TPS would continually and substantially expand the category of eligible aliens. We decline to read the statute in a manner so at odds with its narrowly circumscribed requirements regarding eligibility for Temporary Protected Status. See 8 U.S.C. § 1254a(c)(1)(A).

Additionally, while not dispositive to our reading of the statute, we note that the BIA and Attorney General have taken the consistent position that an extension of TPS does not change the date of designation for purposes of the "continuous physical presence" requirement. See, e.g., 72 Fed. Reg. 29,529, 29,533 (May 29, 2007) ("An extension of a TPS designation does not change the required dates of continuous residence and continuous physical presence . . .") (emphasis added); see also Cervantes, 597 F.3d at 234-235 (summarizing the BIA and Attorney General's consistent position and observing that the extension notices have expressly required registrants to meet the

31

dates set by the original designation of TPS).

C.

Without the necessity of resorting to <u>Chevron</u> or even <u>Skidmore</u> deference, we determine that Congress spoke unambiguously when it required that TPS applicants demonstrate continuous residency from the date designated by the Attorney General and continuous physical presence from the most recent designation. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." <u>Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 842-843 (1984). "[A] statute's silence on a given issue does not confer gap-filling power on an agency unless the question is in fact a gap–an ambiguity tied up with the provisions of the statute." <u>Lin-Zheng v. Att'y Gen.</u>, 557 F.3d 147, 156 (3d Cir. 2009) (en banc) (quoting <u>Sun Wen Chen v. Att'y Gen.</u>, 491 F.3d 100, 113 (3d Cir. 2007), <u>overruled on other grounds by</u> <u>Lin-Zheng</u>, 557 F.3d 147). We are in accord with the <u>Cervantes</u> concurrence, and reach "the same result [as the <u>Cervantes</u> court] simply by concluding that Congress spoke unambiguously as to this particular requirement for temporary protected status." <u>Cervantes</u>, 597 F.3d at 237-238 (Traxler, C.J., concurring) (citing <u>Gen. Dynamics Land Sys., Inc. v. Cline</u>, 540 U.S. 581, 600 (2004) ("[D]eference to [the agency's] statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent.")); <u>see also</u> <u>Cuevas-Gaspar</u>, 430 F.3d at 1032 (Fernandez, J., dissenting).

We hold that the "continuous residence" requirement cannot be met via imputation and that the statutory term "most recent designation" applies to the original designation of a state for TPS and not to subsequent extensions. Accordingly, because

32

Petitioners have indisputably failed to personally satisfy the "continuous residence" and "continuous physical presence" requirements, they are statutorily ineligible for TPS and therefore we will deny their petitions for review. See 8 U.S.C. § 1254a(c)(1)(A)(i)-(ii).

V.

We are left with the matter of De Leon-Ochoa's petition for review of the BIA's denial of his applications for asylum, withholding of removal, and CAT protection. For the reasons that follow, we will deny review of the BIA's order on this issue.

We review the BIA's decision for substantial evidence, and factual determinations are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). An alien may be granted asylum if he is a "refugee" who is "unable or unwilling" to return to his native country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . ." 8 U.S.C. § 1101(a)(42). De Leon-Ochoa conceded that he did not suffer past persecution and therefore to prevail on his claim he must establish a well-founded fear of persecution if returned to Honduras, by demonstrating both a subjective and an objective fear of future persecution. See, e.g., Lie v. Ashcroft, 396 F.3d 530, 536 (3d Cir. 2005).

We have reviewed the record and conclude that there was substantial evidence to support the IJ and BIA's denial of De Leon-Ochoa's application for asylum. Petitioner claims he is in danger of future persecution based on a long-standing inter-family blood feud. His contentions are belied by the record. Petitioner's brothers have remained in Honduras, unmolested.

33

Petitioner himself lived in Honduras for six years after the last alleged feud-based murder, unmolested. Petitioner's own documentary evidence indicates that the blood feud upon which his asylum claim is premised ended in 1996, and he has presented no evidence of additional inter-family strife in the last decade. Accordingly, we cannot conclude that the IJ and BIA erred in denying De Leon-Ochoa's application for asylum. De Leon-Ochoa's failure to meet his burden of proof for asylum necessarily impels the conclusion that he cannot satisfy his burden of proof for withholding of removal. See, e.g., Guo v. Ashcroft, 386 F.3d 556, 561 n.4 (3d Cir. 2004).

Finally, to qualify for protection under the CAT, De Leon-Ochoa must prove that "it is more likely than not that he [] would be tortured if removed to [Honduras]." 8 C.F.R. § 1208.16(c)(2); see Sevoian v. Ashcroft, 290 F.3d 166, 174-175 (3d Cir. 2002). Petitioner has identified no evidence to compel the conclusion that it is more likely than not that he will be tortured upon return to Honduras. Accordingly, we agree with the BIA's denial of his application for protection under the CAT and will deny the petition for review.

*****

For the foregoing reasons, we will deny the petitions for review.[9]

---

[9] We note that the attorneys representing Petitioners on these petitions for review have done so on a pro-bono basis and we thank them for these services, which have been in the highest tradition of the bar.